NEIL PAPIANO, ESQ. CSB # 031811
IVERSON, YOAKUM, PAPIANO & HATCH
624 South Grand Avenue, 27th Floor
Los Angeles, California 90017-3328
Tel. 213/624-7444; FAX 213/629-4563

Attorneys for Plaintiff BOB BAFFERT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOB BAFFERT,<br><br>    Plaintiff<br><br>    v.<br><br>CALIFORNIA HORSE RACING BOARD, ROY C. WOOD, JR., IN HIS CAPACITY AS THE EXECUTIVE DIRECTOR OF THE CALIFORNIA HORSE RACING BOARD; AND ROBERT H. TOURTELOT, JOHN C. HARRIS, SHERYL L. GRANZELLA, MARIE G. MORETTI, ALAN W. LANDSBURG, WILLIAM A. BIANCO, AND ROGER H. LICHT, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE CALIFORNIA HORSE RACING BOARD,<br><br>    Defendants. | CASE NO. 01-07363 DT (BQRx)<br><br>PLAINTIFF BOB BAFFERT'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION OF ISSUES<br><br>DATE:   April 15, 2002<br>TIME:   10:00 a.m.<br>PLACE:  Roybal 880<br><br>The Honorable Dickran M. Tevrizian, Judge Presiding<br><br>Date Action Filed:   August 23, 2001<br><br>TRIAL DATE:   December 10, 2002 |

Plaintiff, Bob Baffert, ("Baffert") submits the following Separate Statement of Undisputed Facts in support of his Motion for Summary Judgment, or alternatively, for Summary Adjudication of Issues.

---

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

| | Undisputed Material Fact | Supporting Evidence |
|---|---|---|
| 1. | This action is brought by Plaintiff Bob Baffert ("Plaintiff") for violation of Plaintiff's Constitutional right to fair administrative hearing pursuant to 42 U.S.C. §1983 against Defendants California Horse Racing Board, Roy C. Wood, Jr., John C. Harris, Sheryl L. Granzella, Marie G. Moretti, Alan W. Landsburg, William A. Bianco, and Roger H. Licht (collectively "Defendants"). | Plaintiff's First Amended Complaint; Declaration of Neil Papiano ¶5. |
| 2. | Plaintiff is a trainer of thoroughbred race horses licensed by the California Horse Racing Board ("CHRB"). | Declaration of Neil Papiano ¶6; |
| 3. | The CHRB is an administrative agency of the State of California overseeing the State's horse racing industry. | Declaration of Neil Papiano ¶7. |
| 4. | Defendant Wood is the Executive Director of the CHRB, and Defendants Harris, Granzella, Moretti, Landsburg, Bianco, and Licht are current members of the "Board" of the CHRB, all of whom are being sued individually in their official capacities with the CHRB. | Plaintiff's First Amended Complaint; Declaration of Neil Papiano ¶7. |
| 5. | On May 3, 2000, a urine sample and blood samples were obtained from the thoroughbred filly, Nautical Look, a horse trained by Plaintiff, following the horse's victory in the Seventh race at Hollywood Park. | Appendix Vol. IV, Item 20. |
| 6. | Truesdail Laboratories ("Truesdail"), the laboratory which tested Nautical Look's urine sample, reported to the CHRB on May 16, 2000 a positive urine presence of morphine. | Appendix Vol. IV, Item 21. |
| 7. | Truesdail Laboratories did not run a test to quantify the amount of morphine found in the sample, but provided a "semi-quantitative, very rough approximation." The urine sample was alleged by the CHRB to contain approximately seventy-three (73) nanograms per milliliter of morphine (73 billionths of one gram), "73 ng/ml". | Testimony of Dr. Norman Hester, Appendix Vol. III, Item 10 TR., pp.45:9-46:14; Appendix Vol. IV, Item 36 TR., pp.116:17-117:9; Appendix Vol. IV, Item 40. |
| 8. | Truesdail estimated the amount of the value of morphine using a method which, according to Dr. Hester, would have a "fairly large uncertainty" in it. | Testimony of Dr. Norman Hester, Appendix Vol. IV, Item 36 TR., pp.116:17-117:9. |
| 9. | A nanogram is one billionth of a gram. | Testimony of Dr. Steven A. Barker Appendix Vol. IV, Item 22 TR., p.141:9-13. |

| | Undisputed Material Fact | Supporting Evidence |
|---|---|---|
| 10. | Defendants (the CHRB) filed a Complaint against Plaintiff alleging a violation of the Trainer Insurer Rule, Section 1887 of the California Code of Regulations ("C.C.R."). | CHRB Complaint, Appendix Vol. III, Item 18. |
| 11. | Plaintiff has denied that he, or any of his employees, administered morphine to Nautical Look before the race in question. | Notice of Defense, Appendix Vol. IV, Item 23. |
| 12. | The CHRB also charged Plaintiff in the Complaint with violating C.C.R. Rule 1843(d), which provides that a finding by an official chemist that a test sample from a horse contains a substance not approved by the CHRB "shall be **prima facie evidence** that the trainer and his/her agents responsible for the care of the horse has/have been **negligent** in the care of the horse and is prima facie evidence that the drug substance has been **administered** to the horse." | CHRB Complaint, Appendix Vol. III, Item 18; Appendix Vol. I; Item 4. |
| 13. | Truesdail discarded and destroyed the official blood sample and the CHRB discarded the split blood sample without conducting any test on the blood samples and before the charging complaint was filed against Plaintiff, and without notification to Plaintiff. | Testimony of Dr. Norman Hester Appendix Vol. II, Item 10 TR., pp.50:24-53:9; Vol. IV, pp.84:7-13, 118:12-18 Testimony Dr. Ronald C. Jensen Appendix Vol. IV, Item 35 TR., pp.57:16-19, 60:28-61:27; Appendix Vol. IV, Item 38. |
| 14. | It was not until the hearing before the Board of Stewards that Defendants disclosed <u>for the first time</u> that Defendants (1) did not perform any confirming tests on the blood samples after the urine sample had allegedly tested positive for morphine, as required by regulations and law and the Agency's publicly bid contract with its own testing laboratory, and (2) had intentionally destroyed the blood samples. | Testimony of Dr. Norman Hester Appendix Vol. II, Item 10 TR., p.84:14-85:28; Testimony Dr. Ronald C. Jensen, Appendix Vol. II, Item 10 TR., p.36:19-26. |
| 15. | Plaintiff was out of state at the time of the race in question. | Testimony of Bob Baffert, Appendix Vol. IV, Item 34; TR., pp.7:18-21; CHRB Investigative Report Appendix Vol. IV, Item 26, pp.3,4. |
| 16. | Dr. William Bell, the official veterinarian employed at the Hollywood Park racetrack on May 3, 2000, was in charge of supervising the running of the receiving barn, which is where the horses are tested. He personally withdrew blood samples from each test horse for a particular race. They were then sealed and labeled by the tester and given to the evidence clerk. | Testimony of Dr. William Bell, State Track Veterinarian, Appendix Vol. IV, Item 37, TR, pp.33:23-34:5. |

3

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

| Undisputed Material Fact | Supporting Evidence |
|---|---|
| 17. In this case, a **urine** sample was collected from Nautical Look by CHRB personnel under the direction of Dr. Bell. The sample was divided in two containers. One container of urine is sent to Truesdail, the laboratory used by the CHRB, and the other was sent to the CHRB's office in Sacramento for safekeeping and storage in an evidence locker. | Testimony of Dr. William Bell; Appendix Vol. IV, Item 37 TR., pp.38-44. Testimony of Dr. Jensen, Appendix Vol. IV, Item 35 TR., p.44. |
| 18. In this case, two vials of **blood** were extracted from Nautical Look and were held by Defendants. Each sample was marked with an identifying label. One vial of blood was sent to Truesdail and the other was sent to the CHRB's office in Sacramento and stored as a "split sample." | Testimony of Dr. William Bell Appendix Vol. IV, Item 37; TR., pp.38-44; Testimony of Dr. Ronald C. Jensen Appendix Vol. IV, Item 35 TR., p.56. |
| 19. The CHRB publicly and competitively contracted with Truesdail Laboratories to provide testing of the blood and urine samples obtained following California horse races. The contract provides that "[e]very equine urine and blood samples shall be initially tested to detect any and all drug substances foreign to the horse." | Appendix Vol. I, Item 5, pp.1, 17. |
| 20. The contract further states:<br><br>"In the event that an analytical finding is made in a post race urine the corresponding blood sample must also be further tested for the presence of he compound found in the urine sample." | Appendix Vol. I, Item 5, p.18. |
| 21. No confirmatory blood tests were conducted in this case on either the blood sample in Truesdail's possession or on the split sample in the CHRB's possession. Both blood samples were destroyed by Defendants without being tested. | Testimony of Dr. Norman Hester Appendix Vol. II, Item 10 TR., pp.84, 118; Testimony of Dr. Ronald C. Jensen Appendix Vol. IV, Item 35 TR., p.61. |
| 22. Dr. Norman Hester, the Technical Director of Truesdail Laboratories, testified before the Board of Stewards that the urine sample was tested and found positive for the presence of morphine. The results showed the amount to be approximately 73 nanograms per milliliter (73 ng/ml). | Testimony of Dr. Norman Hester Appendix Vol. II, Item 10 TR., p.32. Appendix Vol. IV, Items 21 and 40. |

| | **Undisputed Material Fact** | **Supporting Evidence** |
|---|---|---|
| 23. | 73 nanograms of morphine is a <u>pharmacologically insignificant</u> amount which could not have affected the horse in any way or influenced the outcome of the race in any manner. Dr. Barker testified as an expert witness before the Board of Stewards that this amount is a pharmacologically insignificant amount which could not have affected the performance of the horse. | Testimony of Dr. Steven A. Barker Appendix Vol. IV, Item 22 TR., 155:13-156:11, 160:25-162:12. |
| 24. | Dr. Norman Hester testified Nautical Look's blood sample in Truesdail's possession was not tested to confirm the presence of morphine detected in the urine sample, but the blood sample was intentionally discarded and destroyed prior to the urine being tested. | Testimony of Dr. Norman Hester Appendix Vol. II, Item 10 TR., pp.84, 118, 132. |
| 25. | The CHRB's Equine Medical Director, Dr. Ronald C. Jensen, testified the second blood sample (the "split" sample), which was held in an evidence locker in Sacramento, was intentionally discarded and destroyed after the Agency was notified by Truesdail that the urine sample from Nautical Look had tested positive for a minute amount of morphine. | Testimony of Dr. Ronald C. Jensen Appendix Vol. IV, Item 35 TR., pp.60-61; Appendix Vol. IV, Item 38; Appendix Vol. IV, Item 21. |
| 26. | The split sample was discarded and destroyed <u>before</u> the CHRB filed its complaint and instituted administrative proceedings against Plaintiff on August 2, 2000. | See and compare Complaint, Appendix Vol. III, Item 18 and Appendix Vol. IV, Item 38. |
| 27. | Defendants failed to inform any trainers or horsemen of Defendants' policy of destroying blood samples and not performing confirmatory blood tests in all cases. | Testimony of Dr. Ronald C. Jensen Appendix Vol. II, Item 10 TR., p.35; Testimony of Dr. Norman Hester Appendix Vol. IV, Item 36 TR., pp.84:14-85:28. |
| 28. | Plaintiff first discovered the destruction of the blood samples at the hearing before the Board of Stewards. | Declaration of Neil Papiano ¶18(j). |
| 29. | The blood can be tested and will disclose the presence of morphine, if in fact, morphine had been administered to the horse prior to the race. | Declaration of Dr. Steven A. Barker, ¶¶9-12; Testimony of Dr. Ronald C. Jensen Appendix Vol. IV, Item 35 TR., pp.71:23-72:8; Appendix Vol. IV, TR., p.162. |

5

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

| | Undisputed Material Fact | Supporting Evidence |
|---|---|---|
| 30. | 73 nanograms per milliliter is a pharmacologically insignificant level of morphine. This is a low level of a naturally occurring environmental substance. That amount is consistent with environmental contamination and inconsistent with any intentional administration to the animal. If someone intentionally administered morphine to a horse, even in a noneffective dose 3 hours prior to the race, the concentration of morphine in the urine would be in the thousands of nanograms per ml. Also, the blood levels would remain detectable for up to 24 hours after that kind of intentional administration and would rapidly reach levels approximating hundreds of nanograms per ml. | Appendix Vol. IV, Item 22, TR., pp.156-162. |
| 31. | Following an investigation, the CHRB filed a complaint with the Board of Stewards charging Plaintiff will violating Rules 1843(a) and (d), and 1887(a). Rule 1843(a) provides:<br><br>"No horse participating in a race shall carry in its body any drug substance or its metabolites or analogues, foreign to the horse except as hereinafter expressly provided."<br><br>Rule 1843(d) provides:<br><br>"A finding by an official chemist that a test sample taken from a horse contains a drug substance or its metabolites or analogues which has not been approved by the Board... shall be *prima facie* evidence that the trainer and his/her agents responsible for the care of the horse has/have been negligent in the care of the horse and is *prima facie* evidence that the drug substance has been administered to the horse." | See Statement of Decision of Board of Stewards, Appendix Vol. I, Item 2 at p.1; Appendix Vol. III, Item 18; Appendix Vol. I, Item 4, pp.9, 10. |

6

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

| | **Undisputed Material Fact** | **Supporting Evidence** |
|---|---|---|
| 32. | Rule 1887(a) (Trainer Insurer Rule) provides, in pertinent part:<br><br>"The trainer is the absolute insurer of and responsible for the condition of the horses entered in a race, regardless of the acts of third parties, except as otherwise provided in this article. If the chemist or other analysis of urine or blood test samples or other tests, **prove positive** showing the presence of any prohibited drug substance defined in Rule 1843.1 of this division, the trainer of the horse may be fined, his/her license suspended or revoked, or be ruled off. . . ." | Appendix Vol. I, Item 1. |
| 33. | After lengthy hearings and testimony of numerous witnesses involved in the care and testing of the horse, the Board of Stewards concluded Plaintiff had violated the Trainer Insurer Rule and had failed to meet the standards of mitigating circumstances as set forth in Rule 1888(c) (Defense to Trainer Insurer Rule). | Appendix Vol. I, Items 1 and 2, p.7. |
| 34. | Rule 1888 provides:<br><br>"A trainer or other person charged with a violation of Rule 1887 of this division may defend, mitigate or appeal the charge if:<br><br>(c) He shows, by a preponderance of evidence, that he made every reasonable effort to protect the horses in his care from tampering by unauthorized persons. . . ." | Appendix Vol. I, Item 1. |
| 35. | The Board of Stewards stated in their decision:<br><br>"Neither the California Horse Racing Board Rules and Regulations, nor the California Horse Racing Law mandates that a finding in blood must corroborate a finding in the urine. . . . While the Stewards are concerned about the circumstances leading to Truesdail Laboratories randomly discarding blood samples, it is our position that lack of blood sample did not warrant a dismissal of the case before us."<br><br>The Board thereafter Ordered Plaintiff's license suspended for 60 days for violation of Rules 1843(a) and 1887. | Appendix Vol. I, Item 2, p.7. |

7

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

| **Undisputed Material Fact** | **Supporting Evidence** |
|---|---|
| 36. The publicly bid contract between CHRB and Truesdail Laboratories requires confirmatory blood tests in cases where urine tests positive for a prohibited substance. The Truesdail contract, which can be changed only through publicly noticed procedures pursuant to the Administrative Procedure Act, sets forth the following required procedures:<br><br>"Every equine urine and blood sample shall be initially tested to detect any and all drug substances foreign to the horse. . . . In addition, every urine sample shall be tested using targeted analysis with specific immunoassays. . . . Every sample whose screening test through immunoassay is indicative of the presence of one or more prohibited drug substances. . . shall be tested further by using the gas chromatography/mass spectrometry (GC/MS) for positive confirmation of the identity of the chemical substance(s) detected in the sample.<br><br>"Confirmation of Detected Substance: The testing of any specimen which produces a chemical finding indicative of the presence of a drug substance. . . shall be tested further. . . . Confirmation of suspect samples will routinely include. . . a blank urine/blood extracted the same way and at the same time as the sample; extract of urine/blood containing suspect(s). . . . In the event that an analytical finding is made in a post race urine the corresponding blood sample must also be further tested for the presence of the compound found in the urine sample." | Appendix Vol. I, Item 5, pp.17-18. |
| 37. The express legislative intent in empowering the CHRB to adopt equine medication regulations to determine illegal or excessive use of substances is that the CHRB recognize the greater importance of conducting <u>complete and thorough testing</u> of a lesser number of samples in preference to conducting less thorough testing on a greater number of samples. | Business and Professions Code, §§19580(a) and (b), Appendix Vol. I, Item 6. |

8
PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

| Undisputed Material Fact | Supporting Evidence |
|---|---|
| 38. This Court previously issued a preliminary injunction enjoining Defendants from pursuing further administrative proceedings against Plaintiff until it could produce the blood samples of Nautical Look taken after the May 2, 2000 race in question. At the time this Court issued the preliminary injunction, this Court made the following findings as a matter of law: (1) the CHRB has been delegated the authority by the State of California to prosecute individuals for violations of the Insurance Trainer Rule which may result in the damage or loss of a trainer's livelihood and reputation; (2) Defendants' publicly bid drug testing contract requires confirmatory blood tests where urine samples of post-race horses test positive for prohibited substances; (3) Defendants intentionally violated those requirements when they destroyed Nautical Look's blood samples, which constituted potentially exculpatory evidence; (4) Plaintiff was deprived of his ability to provide an adequate defense as a result of Defendants' destruction of the blood samples, resulting in the deprivation of Plaintiff's constitutional right to a fair hearing, especially in view of the fact that only 73 ng/ml of the prohibited substance was detected (a pharmacologically insignificant amount which could not have affected the performance of the horse or influenced the outcome of the race in any manner; and (5) Plaintiff's reputation and cash flow have been compromised as a result of the Defendants' actions. | Order and Findings of Fact in this case, dated 11-19-2000. |

## UNDISPUTED MIXED STATEMENTS OF FACT AND LAW

1. In contradiction of their own rules and regulations to test both urine and blood samples, Defendants secretly discarded and destroyed the official and split blood samples, thereby depriving Plaintiff of his right to defend himself in the disciplinary hearings with scientific exculpatory evidence.

2. Defendants' secret policy of destroying blood samples also directly violates the express intent of the California Legislature as stated in the California Business and Professions Code §19580, which provides:

    "(a) The board shall adopt regulations to establish policies, guidelines, and penalties relating to equine medication in order to preserve and enhance the integrity of horse racing in the state. Those policies, guidelines, and penalties shall include, at minimum, the provisions set forth in this article.

    "(b) It is the intent of the Legislature that the board, in its testing efforts to determine illegal or excessive use of substances, *recognize the greater importance of conducting complete and thorough testing of a lesser number of samples in preference to conduction less thorough testing on a greater number of samples.*" [Emphasis added.]

3. Defendants, in their official capacity as officers and board members of the CHRB, have failed to conduct "complete and thorough testing" of Nautical Look's blood samples, and have therefore failed to comply with §19580.

4. Defendants' conduct in destroying the blood samples violated the United States Supreme Court's Trombetta/Brady Rule requiring the State to preserve constitutionally material exculpatory evidence on the issues of guilt and punishment, and this "core duty to preserve evidence under the due process clause of the Fourteenth Amendment applies to administrative hearings per Scott v. Meese, 174 Cal.App.3d 249 (1985).

5. Defendants, in their official capacity, as both an investigative and a prosecutorial entity, had control over the blood samples and had a duty to preserve the evidence for testing by Plaintiff, especially evidence they knew or should have known had exculpatory value.

6. By violating California's rules and regulations, and its own publicly bid contract, and by continuing to pursue administrative proceedings against Plaintiff, Defendants have denied and continue to deny Plaintiff a constitutionally fair hearing by destroying the exculpatory evidence which could demonstrate the urine test was either a false positive, or that the finding in the urine was the result of accidental environmental contamination rather than a pre-race administration by Plaintiff or his agents. As a result of Defendants' intentional destruction of the blood samples, Plaintiff is denied the opportunity to rebut the evidence against him, a right entitled to him under California Government Code §11513(b).

7. The public interest in the integrity of Horse Racing and in protecting the Constitutional rights of its citizens supports a granting of a permanent injunction.

8. Injunctive relief is an appropriate remedy in civil rights actions under 42 U.S.C. §1983, particularly in a case such as this, where Defendants' pursuit of accusations against Plaintiff will result in the continuing deprivation of Plaintiff's Constitutional rights.

Dated: April 17, 2002

Respectfully submitted,

IVERSON, YOAKUM, PAPIANO & HATCH

By: _____
NEIL PAPIANO
Attorneys for Plaintiff BOB BAFFERT

Dated: 4-22-02

DICKRAN TEVRIZIAN
DICKRAN TEVRIZIAN, JUDGE
UNITED STATES DISTRICT COURT

11
PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

## PROOF OF SERVICE
(C.C.P. §§1013a, 2015.5)

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF LOS ANGELES    )

I am employed in the aforesaid County, State of California; I am over the age of eighteen years and not a party to the within entitled action; my business address is: 1111 W. Sixth St., Los Angeles, CA 90026 (First Class Attorney Service).

On **April 17, 2002**, I served the foregoing **PLAINTIFF BOB BAFFERT'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION OF ISSUES** on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Bill Lockyer, Attorney General
Judith Seligman, Esq.
Jerald L. Mosley, Esq.
Deputy Attorney General
300 South Spring Street, Suite 5212
Los Angeles, CA 90013

[ X ] **BY MAIL:** I caused such envelope to be deposited in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X] I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed on **April 17, 2002** at Los Angeles, California.

_Giselle A. Hatch_
Giselle A. Hatch